Craig H. Durham
Deborah A. Ferguson
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, ID 83702
T: (208) 724-2617
F: (208) 906-8663
chd@fergusondurham.com
daf@fergusondurham.com

Richard Eppink
Megan Harrigfeld
WREST COLLECTIVE
PO Box 102
Boise ID 83701
T: (208) 371-9752
F: (208) 567-1998
ritchie@wrest.coop
megan@wrest.coop

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HALLIE JOHNSON, the personal representative of the ESTATE OF MILO VANCE WARNOCK,<br><br>     Plaintiff,<br><br> v.<br><br>STATE OF IDAHO, DEPARTMENT OF CORRECTION; RANDY VALLEY; JOSEPH COELHO; AARON PRYOR; TYLER NICODEMUS; JAIME URIBE; ARTURO TELLO; ERIC NEBEKER; CORY BARRIER; PHILLIP DAVIS; GREGORY WOOTEN; CHRISTOPHER HONN; JAMES MCKINLEY; and JOHN AND JANE DOES 1 - 5;<br><br>     Defendants. | Case No.  1:25-cv-679<br><br>**CIVIL RIGHTS COMPLAINT**<br><br>**42 U.S.C. § 1983**<br><br><br>**JURY TRIAL DEMANDED** |

1

## INTRODUCTION

On December 10, 2023, Milo Warnock was beaten to death in his locked prison cell by his violent, unstable, and erratic cellmate, James Michael Johnson. This tragedy never should have happened.

Milo Warnock was a non-violent person with a big heart who lived a relatively stable life while also trying to manage his bipolar disorder and alcoholism. He was in prison serving a short term for a felony DUI. James Johnson, on the other hand, was a seven-time felon, a schemer, and a manipulator who racked up violent disciplinary offenses and burned through cellmates because of his bad behavior. Prison officials locked a sheep in with a wolf and wouldn't let him out. The result was inevitable.

The Personal Representative of Mr. Warnock's Estate brings this lawsuit to hold the defendants accountable for his horrific and needless death and to compensate his heir for the sudden loss of his companionship and support.

## JURISDICTION AND VENUE

1.      Plaintiff brings the federal claims under 42 U.S.C. 1983. The claims arise under the Eighth and Fourteenth Amendments. The Court has jurisdiction under 28 U.S.C. § 1331 and § 1343(a)(3).

2.      Plaintiff's claims arose in the District of Idaho and, on information and belief, all Defendants live in the District. Venue is proper here under 28 U.S.C. § 1391.

3.      The Court has supplemental jurisdiction to hear the state law claim under 28 U.S.C. § 1367(a) because the facts are so related to the claims for which there is original jurisdiction that they form part of the same case or controversy.

## PARTIES

4.      Plaintiff Hallie Johnson is the Personal Representative of the Estate of Milo Vance Warnock. She resides in Seattle, Washington. The Estate was established in Ada County, Idaho. Milo Warnock's sole heir, Mason Warnock, has affirmatively consented to the Personal Representative of the Estate representing his interests in this lawsuit, including bringing a wrongful death claim on his behalf.

5.      Defendant Idaho Department of Correction is a state agency within the executive branch of the state of Idaho. As such, it is the State for purposes of the Idaho Tort Claims Act, Idaho Code §§ 6-902(1), (3). The Idaho Department of Correction is liable because its employees, acting within the course and scope of their employment and with reckless, willful, and wanton conduct, caused Milo Warnock's wrongful death, resulting in damages.

6.      Defendant Randy Valley was employed at all relevant times by the Idaho Department of Correction and was acting under color of state law. Defendant Valley was the Warden of the Idaho State Correctional Center at the time that Mr. Warnock was murdered. As the Warden, he held the ultimate responsibility to ensure adequate staffing within his institution so that all inmates were protected from harm. The Idaho

State Correctional Center, and specifically G Block within ISCC, was openly and notoriously understaffed at the relevant time, which contributed to Mr. Warnock's death. Plaintiff sues Defendant Valley in his individual capacity for damages.

7.     Defendant Joseph Coelho was employed at all relevant times by the Idaho Department of Correction and was acting under color of state law. Defendant Coelho was the Move Coordinator at the Idaho State Correctional Center. Plaintiff sues Defendant Coelho in his individual capacity for damages.

8.     Defendant Aaron Pryor was employed at all relevant times by the Idaho Department of Correction and was acting under color of state law. Defendant Pryor was the Housing Lieutenant at the Idaho State Correctional Center. Plaintiff sues Defendant Pryor in his individual capacity for damages.

9.     Defendant Tyler Nicodemus was employed at all relevant times by the Idaho Department of Correction and was acting under color of state law. Defendant Nicodemus was a Captain, immediately below the Deputy Wardens in the chain of command. Plaintiff sues Defendant Nicodemus in his individual capacity for damages.

10.     Defendant Jaime Uribe was employed at all relevant times by the Idaho Department of Correction and was acting under color of state law. Defendant Uribe was a correctional officer assigned to G Block on December 10, 2023. Plaintiff sues Defendant Uribe in his individual capacity for damages.

11.     Defendant Arturo Tello was employed at all relevant times by the Idaho Department of Correction and was acting under color of state law. Defendant Tello was a correctional officer assigned to G Block on December 10, 2023. Plaintiff sues Defendant Tello in his individual capacity for damages.

12.     Defendant Eric Nebeker was employed at all relevant times by the Idaho Department of Correction and was acting under color of state law. Defendant Nebeker was a correctional officer assigned to G Block on December 10, 2023. Plaintiff sues Defendant Nebeker in his individual capacity for damages.

13.     Defendant Phillip Davis was employed at all relevant times by the Idaho Department of Correction and was acting under color of state law. Defendant Davis was a correctional officer assigned to G Block on December 10, 2023. Plaintiff sues Defendant Davis in his individual capacity for damages.

14.     Defendant Cory Barrier was employed at all relevant times by the Idaho Department of Correction and was acting under color of state law. Defendant Barrier was a correctional officer assigned to G Block on December 10, 2023. Plaintiff sues Defendant Barrier in his individual capacity for damages.

15.     Defendant James McKinley was employed at all relevant times by the Idaho Department of Correction and was acting under color of state law. Defendant McKinley was a shift sergeant on December 10, 2023. As such, he was responsible for ensuring that sufficient staff were on site and able to conduct safety tier checks as

required by policy. Plaintiff sues Defendant McKinley in his individual capacity for damages.

16. Defendant Gregory Wooten was employed at all relevant times by the Idaho Department of Correction and was acting under color of state law. On information and belief, Defendant Wooten was a shift command sergeant who James Johnson informed of the substantial risk of harm to Mr. Warnock if Johnson was not moved from the same cell. Plaintiff sues Defendant Wooten in his individual capacity for damages.

17. Defendant Christopher Honn was employed at all relevant times by the Idaho Department of Correction and was acting under color of state law. On information and belief, Defendant Honn was a shift command sergeant who James Johnson informed of the substantial risk of harm to Mr. Warnock if Johnson was not moved from the same cell. Plaintiff sues Defendant Honn in his individual capacity for damages.

18. John or Jane Does No. 1 through 5 are presently unidentified Idaho Department of Correction or Centurion of Idaho, LLC, employees who knew of the substantial risk of serious harm to Mr. Warnock, or should have known of that risk, and failed to protect Mr. Warnock from that harm. These Doe Defendants include, but are not limited to, individuals who were put on notice of the dangerous situation in the shared cell through formal or informal communication with Mr. Warnock, Mr. Johnson,

or both. Plaintiff sues John and Jane Does 1 through 5 in their individual capacities for damages.

## FACTS COMMON TO ALL CLAIMS

### Milo Warnock Was a Beloved, Kind, and Gentle Man

19.     At the time of his murder, Milo Warnock was 45 years old.

20.     He had an adult son, Mason Warnock, who is on the autism spectrum. Mr. Warnock and Mason were close.

21.     Mason lives in a group home. Mr. Warnock helped his disabled son navigate adult life.

22.     Mason relied on his dad for love, support, and companionship. They were planning on getting an apartment together after Mr. Warnock was released from prison.

23.     Mason affirmatively consents to the Personal Representative representing his interests in this action and bringing a wrongful death claim on his behalf.

24.     Mr. Warnock was close to his parents, Michael and Kathy, and his sister, Hallie. They would talk often and support each other through life's various triumphs and challenges.

25.     He also had a loving and supportive extended family.

26.     He lived in Boise for about 25 years.

27.     He was a journeyman sheet metal craftsman, employed at YMC of Meridian where he worked as a brake press operator.

28.     He was also a man of many talents outside of work. He loved to read and talk about great works of literature, religion, and philosophy. His goal was to someday be an author.


Milo Warnock

29.     One of the challenges that Mr. Warnock faced in life was bipolar disorder. Sometimes, particularly, he would fall into a deep depression.

30.     Yet he managed his mental health relatively well with counseling and medication.

31.     He also struggled with a co-occurring alcohol use disorder. He had lengthy periods of sobriety.

32.     Since about 2017, Mr. Warnock had been sober.

33.     In 2021, however, he was charged with a DUI. Earlier that year, he was diagnosed with encephalopathy, which is a general term for a disease or damage to the

brain that can result in symptoms like disorientation, confusion, and even seizures. He stated that he experienced an encephalitic episode the night he incurred his last DUI.

34.     Because he had a previous DUI conviction within 15 years, this most recent charge was a felony.

35.     While he waited to be screened for mental health court and probation – which dragged on for nearly two years – he rode his bicycle everywhere and complied with the rules of pretrial release.

36.     In 2023, he was late to an appointment because of a flat tire on his bike. He called from the side of the road and explained the situation.

37.     The rescheduled appointment was set for the same day as a U/A test. Mr. Warnock misjudged his timing and was 22 minutes late to the rescheduled appointment.

38.     The judge told him he would not get another chance and sentenced him to a minimum of two years and a maximum of 10 years in prison.

### Prison Officials Punish Mr. Warnock When He Resorts to Self-Help for his Mental Health

39.     In August of 2023, Mr. Warnock arrived at the Idaho State Correctional Institution.

40.     There, officials processed and classified him.

41.     Mental health providers noted his bipolar disorder. They prescribed Effexor and Lithium.

42.     He had been taking Effexor for a long time, and it was managing his depression well.

43.     He was assigned to F Block at the Idaho State Correctional Center.

44.     F Block is a general population unit. Residents are allowed out of their cells most of the day, and they have access to other parts of the prison, including areas for programming, education, and outdoor recreation.

45.     Mr. Warnock was given his Effexor in the evenings at pill call. Previously he took it in the morning because one of the side effects that he experienced was insomnia.

46.     As a result, he was awake all night, and he would sleep most of the day.

47.     He tried to contact the prison medical providers so that they would change the time of day that his medication was dispensed.

48.     He found a carbon copy Health Services Request (HSR) on his tier.

49.     Under prison policy, inmates must use an HSR to seek medical care.

50.     Mr. Warnock filled the HSR out and believed that he had routed it properly to the medical provider.

51.     What he did not know – because he had not been told during his intake processing – was that IDOC had changed how residents made health service requests, going from paper submissions to electronic HSRs.

52.     He did not receive a response to his written HSR.

53.    When the providers failed to respond to his reasonable request, he started "cheeking" his medication at the evening pill call and saving it overnight.

54.    He would then take his medication the following morning.

55.    Instead of sleeping all day and staying awake all night, taking the medication in the morning helped him get on the same daily routine as all others on his unit.

56.    On September 5, 2023, during a cell search, a correctional officer discovered two Effexor pills in Mr. Warnock's possession.

57.    It was a violation of prison rules to store medication.

58.    Mr. Warnock explained to the officer that he had saved the pills because when he takes them at night he cannot sleep.

59.    Still, the officer charged him with a disciplinary offense report (DOR).

60.    The charge was for "Possession of Drugs and/or Alcohol."

61.    Possession of Drugs or Alcohol was a Class A DOR, the most serious within the institution.

62.    Idaho Department of Correction policy made no distinction between possessing prescribed mental health medication in a limited amount, indicating a necessary and proper use of that medication, and possessing illegal substances such as methamphetamine.

63.    The DOR raised Mr. Warnock's security points.

64.    At the time, when deciding housing placement following an increase in security points, prison policy either made no individualized determination about an inmate's background or the factual nature of his DOR, or, if it did, the Housing Coordinator ignored those distinctions in Mr. Warnock's case.

65.    Housing Coordinator Joseph Coelho assigned Mr. Warnock to G Block in ISCC.

## Mr. Warnock is Locked Down with a Violent and Unstable Inmate in Dangerous Conditions, and Prison Officials are Warned

66.    G block is the administrative housing unit.

67.    It is a maximum-security unit at ISCC.

68.    It is where the most difficult inmates to manage are housed in ISCC.

69.    G block is known among the inmate population as the "back of the house."

70.    Daily life in G block is harsh, monotonous, and dangerous.

71.    Inmates in G block are locked in their cells for up to 23 hours a day in a cell no bigger than 8 feet by 10 feet, and with a cellmate.

72.    They are allowed fewer privileges than general populations residents.

73.    Idaho has one of the highest per-capita rates of incarceration in the United States, and the Idaho Department of Correction's facilities are critically understaffed.

74.    This is true in G block at ISCC.

75.     The Warden, Randy Valley, was required to ensure adequate staffing at ISCC and in G Block particularly.

76.     The critical understaffing was an open and obvious problem, yet neither Warden Valley nor any other IDOC employee acting within the course and scope of their employment corrected it.

77.     More specifically, the Idaho Department of Correction did not staff G block with an adequate number of correctional officers to ensure the safety of that special housing unit.

78.     The Idaho Department of Correction also did not train its G block staff adequately to keep inmates safe in its dangerous environment.

79.     Due to the combination of the high-risk population housed in G block, chronic understaffing, and the dangerous housing conditions, Defendants were aware that there was a serious risk of violence there, yet they were deliberately indifferent to the risk.

80.     Mr. Warnock was assigned to cell 16, tier 4.

81.     On September 18, 2023, on information and belief, Defendant Joseph Coelho assigned inmate James Johnson to the same cell as Mr. Warnock.

82.     On information and belief, the Housing Lieutenant, Defendant Aaron Pryor, signed off on this placement.

83.     Johnson was a much younger and much bigger inmate than Mr. Warnock.

84.     Johnson was 31 years old at the time.

85.     He is six feet, two inches tall and a solid 190 pounds.

86.     Mr. Warnock was 45 years old. He was five feet, nine inches tall.

87.     Mr. Warnock was a non-violent felon convicted of DUI.

88.     Johnson was a seven-time convicted felon.

89.     Johnson had a history of erratic behavior and likely suffered from mental illness.

90.     Johnson's conduct had gotten increasingly worse in the institution.

91.     He had received several DORs for violence against other inmates.

92.     In at least one incident, he acted in concert with members of a Security Threat Group (STG), otherwise known as a prison gang.

93.     In that DOR, an officer labeled him as associating with STG members during an attack on other inmates. Johnson had had multiple cellmates.

94.     Johnson was known for his history of antagonism, aggressiveness, and bullying toward his cellmates.



James Michael Johnson

95.     In electronic messages to his family, Mr. Warnock expressed alarm about

Johnson.

96.     He described Johnson's conduct as unstable and rambling.

97.     Yet he tried to help Johnson, either for Johnson's sake or to keep the peace

within the small cell. He spent hours crafting a shelf out of cardboard for Johnson, and

read to Johnson at length.

98.     Mr. Warnock also repeatedly tried to get out of G block. He sent "kites"

and at least one grievance informing officials about the poor conditions on the block

and how he did not belong there.

99.     Mr. Warnock talked to a case manager about trying to be housed

somewhere other than G block. That case manager referred him to Captain Tyler

Nicodemus.

15

100.    On information and belief, Mr. Warnock contacted Captain Nicodemus and told him of his desire to move. Captain Nicodemus did not order a housing move, though he had the authority to intervene.

101.    Johnson told Mr. Warnock that they needed to separate from each other because of the building tension in the cell. He said they could still be "friends" but that they just couldn't live together.

102.    Johnson also filled out a "move slip" or a kite requesting a move, which he gave to a presently unidentified John or Jane Doe correctional officer.

103.    In that request, Johnson warned them that something bad was going to happen in the cell unless he or Mr. Warnock were moved.

104.    That request went up the chain of command to a housing sergeant for G Block, believed to be Sergeant Honn or Sergeant Wooten.

105.    The request languished. No action was taken.

106.    Johnson followed up and verbally asked officers what the status of his move request was. He was consistently put off.

107.    None of the Defendants, nor any other IDOC employee or other official, took action to protect Milo.

### Johnson Beats Milo to Death

108.    The inevitable happened in the mid-morning hours of December 10, 2023.

109.     That morning, for at least an hour – and up to an hour and a forty-five minutes – no correctional officer posted to G Block that day, including Defendants Uribe, Tello, Davis, Barrier, or Nebeker, conducted an appropriate safety or tier check as required by prison policy on Johnson and Mr. Warnock's tier.

110.     Officers were required to conduct these tier walks and to look into cells to see "living and breathing" inmates. If they cannot see in a cell, they are required to demand the inmate remove any window covering.

111.     Tier walks at routine and irregular intervals, at least every 30 minutes, are particularly important in housing units that are locked down with dangerous inmates, like G block.

112.     This failure allowed James Johnson to beat Milo Warnock to death.

113.     The beating was so violent that inmates in the surrounding cells heard what sounded like bone crashing on metal or cement.

114.     This beating lasted several minutes, up to 15 to 20 minutes.

115.     There was also a significant pause.

116.     By then, Mr. Warnock was thoroughly incapacitated and helpless.

117.     During this entire time, Johnson was yelling, screaming, and pacing in the cell.

118.     Still, no correctional officer responded.

119.    Johnson then yelled out to an inmate in a nearby cell, saying he was going to kill Mr. Warnock.

120.    That inmate told him not to.

121.    Johnson told him he was going to finish Mr. Warnock off. And that is what he did.

122.    Mr. Warnock endured unspeakable pain and terror as he was being murdered.

123.    Blood started to ooze under the cell door onto the tier.

124.    At no time during this lengthy beating did Defendants Uribe, Tello, Davis, Barrier, or Nebeker respond.

125.    Uribe, Tello, Davis, Barrier, or Nebeker either wholly failed to do any safety check at the correct time or in the correct manner on G block when the beating occurred, or else one or more of these officers did do a tier walk, saw or heard the violence, and ignored it for an unreasonable period of time.

126.    Sergeant McKinley was the shift command sergeant that day. As such, he was responsible for ensuring that G block was sufficiently staffed to conduct safety checks on time while officers also attended to their other tasks.

127.    He failed in that duty.

128.    This recklessness allowed Johnson to beat Mr. Warnock to death without correctional officers stopping it.

18

129.    A little after 11:00 a.m., Officer Phillip Davis alerted other officers that he saw blood coming out of the cell.

130.    Officer Uribe ordered the tier janitors to cell up in the showers.

131.    Uribe called out an emergency and a request for additional staff.

132.    The officers delayed some period of time before opening the cell door.

133.    Several minutes later, Officer J. Davis arrived from a different tier on G block. Once the cell door was opened, she began chest compressions until a nurse from the medical unit arrived, who then took over CPR.

134.    While Johnson was housed in a solitary cell after this event, he told the officer watching him that "his cellmate got what he deserved for not respecting him as a gangster so he had to show him what's up."

135.    There is no evidence Mr. Warnock fought back. He suffered a brutal, macabre, and wholly unchecked execution.

136.    The State later prosecuted James Johnson for first degree murder.

137.    Johnson pleaded guilty.

138.    At his sentencing hearing, he indicated, among other things, that he had warned Idaho Department of Correction officials of the danger, but that they ignored it.

139.    The district court sentenced Johnson to life in prison, with 35 years fixed. It recommended that Johnson be housed without a cell mate, at least until he can be considered safe.

140.    Milo Warnock's family has now been left grieving and bereft, mourning the loss of his love, wit, and companionship because Idaho correctional officials failed to keep him safe.

## CLAIMS FOR RELIEF

## Eighth and Fourteenth Amendments

## 42 U.S.C. § 1983

## I.

## Cruel and Unusual Punishment – Dangerous Housing Placement

**Defendants Coelho, Pryor, and presently unidentified John or Jane Does 1 through 5 violated Mr. Warnock's right to be free from cruel and unusual punishment by authorizing Johnson's placement in the same cell as Mr. Warnock under dangerous conditions.**

141.    Plaintiff incorporates all previous paragraphs.

142.    Defendants Coehlo, Pryor, and John or Jane Does 1 through 5 acted under color of state law;

143.    Mr. Warnock faced a substantial risk of serious harm from being housed in the same cell as the violent, dangerous, and mentally unstable James Johnson.

144.    These Defendants, jointly and severally, were deliberately indifferent to that risk;

145.    That is, these Defendants knew of the substantial risk of serious harm to Mr. Warnock and disregarded it by failing to take reasonable measures to address it; and

146.    These Defendants' deliberate indifference caused Mr. Warnock's death, resulting in damages.

147.    These Defendants acted with reckless or callous indifference to Mr. Warnock's federally protected rights, or were motivated by an evil motive or intent, such that punitive damages should also be awarded.

## II.

### Cruel and Unusual Punishment – Ignoring Requests to Move

**Defendants Honn, Wooten, and John and Jane Does 1 through 5 violated Mr. Warnock's right to be free from cruel and unusual punishment by not protecting him after they were alerted to the danger.**

148.    Plaintiff incorporates all previous paragraphs.

149.    Defendants Honn, Wooten, and John or Jane Does 1 through 5 acted under color of state law;

150.    Mr. Warnock faced a substantial risk of serious harm from being housed and remaining in the same cell as Johnson;

151.    These Defendants were on notice that the housing placement was dangerous and that Mr. Warnock or Johnson wanted to be moved;

21

152.    These Defendants, jointly and severally, were deliberately indifferent to that risk;

153.    That is, these Defendants knew of the substantial risk of serious harm to Mr. Warnock and disregarded it by failing to take reasonable measures to address it; and

154.    These Defendants' deliberate indifference caused Mr. Warnock's death, resulting in damages.

155.    These Defendants acted with reckless or callous indifference to Mr. Warnock's federally protected rights, or were motivated by an evil motive or intent, such that punitive damages should also be awarded.

## III.

## Cruel and Unusual Punishment –Understaffing and Lack of Training

**Defendants Valley, McKinley, and John or Jane Does 1 through 5 violated Mr. Warnock's right to be free from cruel and unusual punishment when they failed to ensure adequate staffing and training on G Block to protect Mr. Warnock from serious harm.**

156.    Plaintiff incorporates all previous paragraphs.

157.    Defendants Valley, McKinley, and John or Jane Does 1 through 5 acted under color of state law;

158.    These Defendants failure to ensure adequate staffing levels and adequate training of staff on G Block at ISCC created a substantial risk of harm for Mr. Warnock;

159.    These Defendants, jointly and severally, were deliberately indifferent to that risk;

160.    That is, they knew of the substantial risk of harm and disregarded it;

161.    These Defendants' deliberate indifference caused Mr. Warnock's death, resulting in damages;

162.    These Defendants acted with reckless or callous indifference to Mr. Warnock's federally protected rights, or were motivated by a malicious or evil intent, such that punitive damages should be awarded.

**IV.**

**Cruel and Unusual Punishment – Inadequate Tier Checks and Response Defendants Uribe, Nebeker, Tello, Barrier, Davis and John or Jane Does 1 through 5 violated Mr. Warnock's right to be free from cruel and unusual punishment when they failed to protect him from Johnson's extreme violence on December 10, 2023.**

163.    Plaintiff incorporates all previous paragraphs.

164.    Defendants Uribe, Nebeker, Tello, Barrier, Davis, and John or Jane Does 1 through 5 acted under color of state law;

165.    Mr. Warnock faced a substantial risk of serious harm from being housed in the same cell as Johnson;

166.     These Defendants, jointly and severally, were deliberately indifferent to that risk;

167.     That is, these Defendants knew of the substantial risk of serious harm to Mr. Warnock and disregarded it by failing to take reasonable measures to address it; and

168.     These Defendants' deliberate indifference caused Mr. Warnock's death, resulting in damages.

169.     These Defendants acted with reckless or callous indifference to the Mr. Warnock's federally protected rights, or were motivated by an evil motive or intent, such that punitive damages should also be awarded.

### STATE LAW CLAIM

### V.

### <u>Wrongful Death – I.C. § 5 – 311, I.C. § 6 - 903(1), I.C. § 6 - 904A(2)</u>

170.     The Personal Representative of the Estate brings this claim on behalf of Mr. Warnock's sole heir, Mason Warnock, with the heir's affirmative consent.

171.     These and other Idaho Department of Correction employees were acting within the course and scope of their employment when they housed Milo Warnock and James Johnson in the same cell.

172.     These and other Idaho Department of Correction employees acted recklessly, willfully, and wantonly in not ensuring Mr. Warnock's safety.

173.    Their reckless, willful, and wanton conduct is illustrated but not limited to any, or all, of the following:

174.    Not having a policy, practice, or custom when deciding housing assignments to separate an inmate with a non-violent background from an inmate with a violent background, or if there was a policy, practice, or custom, by failing to enforce it here;

175.    Not having a policy, practice, or custom that assesses the mental health conditions and needs of potential cellmates before placing them together in a dangerous and closed environment like G block, or, if there was such a policy, practice, or custom, by failing to enforce it here;

176.    Not having a policy, practice, or custom that assesses the individual facts of a disciplinary offense before placing an inmate in a dangerous and closed environment like G block, or, if there was such a policy, practice, or custom, by failing to enforce it here;

177.    Not staffing a special housing unit like G block with adequate correctional officers;

178.    Not adequately training correctional officers in G block;

179.    Refusing to move either Mr. Warnock or Johnson to a different cell;

180.    Not conducting tier walks in an appropriately safe way or manner on G block; or

181.    Not expeditiously providing life saving measures upon discovery that Mr. Warnock had been violently beaten;

182.    These employees' and other employees' reckless, willful, and wanton conduct proximately caused Milo Warnock's death, resulting in damages, including but not limited to the loss of significant companionship and support for his heir.

**PRAYER FOR RELIEF**

A.    WHEREFORE, Plaintiff respectfully prays this Court enters judgment granting her the following:

B.    A declaration that the acts and omissions described herein violated Plaintiff's rights under the Constitution and laws of the United States and the laws of the state of Idaho.

C.    Awarding Plaintiff and Mr. Warnock's heir monetary damages jointly and severally, in an amount to be determined at trial, to fully and fairly compensate them for their damages, including for Mr. Warnock's injuries, present and future loss of income, loss of companionship and support for his heir.

D.    For federal claims, awarding the Estate damages Mr. Warnock's pain and suffering, emotional distress and anguish.

E.    Punitive damages for the federal claims against each Defendant in the amount to be determined at trial.

F.    A jury trial on all triable issues.

G.    Attorney fees, costs, and expenses under 42 U.S.C. § 1988, Idaho Code §§ 12-120,

12-121, and all other relevant statutes and rules.

H.    Any additional relief this Court deems just, proper, and equitable.

Dated this 2nd day of December 2025.

/s/ Craig H. Durham
Craig H. Durham

/s/ Deborah A. Ferguson
Deborah A. Ferguson

/s/Richard Eppink
Richard Eppink

/s/Megan Harrigfeld
Megan Harrigfeld

Counsel for Plaintiff

27