UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

HALLIE JOHNSON, the personal representative of the ESTATE OF MILO VANCE WARNOCK,

Plaintiff,

v.

STATE OF IDAHO, DEPARTMENT OF CORRECTION; RANDY VALLEY; JOSEPH COELHO; AARON PRYOR; TYLER NICODEMUS; JAIME URIBE; ARTURO TELLO; ERIC NEBEKER; ZANE BARRIER; PHILLIP DAVIS; GREGORY WOOTEN; CHRISTOPHER HONN; JAMES MCKINLEY; and JOHN and JANE DOES 1-5,

Defendants.

Case No. 1:25-cv-00679-BLW

**MEMORANDUM DECISION AND ORDER**

## INTRODUCTION

Prison officials are charged with a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). However, not every injury suffered by one prisoner at the hands of another automatically constitutes a violation of the Eighth Amendment by prison officials. *Id*. at 834. This case forces us to consider the boundary between those two

principles.

Before the Court is Defendants' Motion to Dismiss. (Dkt. 13). The Defendants seek to dismiss a lawsuit stemming from what all parties recognize as the unjust and tragic murder of one prisoner, Milo Warnock, by another inside their shared cell within the Idaho State Correctional Center ("ISCC"). The Court held oral argument on August 25, 2026.

Plaintiff Hallie Johnson, as the personal representative of the estate of Mr. Warnock, has sued the Idaho Department of Correction ("IDOC") and several individual defendants who were employed by IDOC and worked at ISCC.

Her first four claims assert violations of the Eighth and Fourteenth Amendments, brought pursuant to 42 U.S.C. § 1983. Her fifth claim, for wrongful death, sounds in state law, under various provisions of the Idaho Code.

In federal court, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). How a plaintiff satisfies that requirement is well-trodden ground. The most recent iteration of pleading requirements stems from two Supreme Court cases, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). These two cases, now foundational to litigation in the federal courts, transformed the pleading requirements from notice pleading, which only had to be specific enough to "give the defendant fair notice of what the plaintiff's claim is and the grounds

upon which it rests" *Conley v. Gibson*, 355 U.S. 41, 47 (1957), to a heightened "plausibility" pleading standard, requiring the complaint to contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

For the reasons explained below, Claims I, II and IV of Johnson's Amended Complaint satisfy the requirements of Rule 8. Claim III and Claim V do so in part. Accordingly, Defendants' motion is granted in part and denied in part.

**BACKGROUND**

In 2021, Milo Warnock was charged with felony Driving Under the Influence. Amd. Compl. ¶¶ 33, 34 (Dkt. 5). Warnock was sentenced to a term of two to ten years in prison and arrived at the Idaho State Correctional Institution in August 2023, where he was assigned to F block, a general population unit. *Id*. at ¶¶ 38-39, 43-44.

Medical staff at the prison prescribed Mr. Warnock Effexor and lithium for his bipolar disorder. *Id*. at ¶ 41. Mr. Warnock had regularly taken Effexor prior to his arrival at prison, and, before incarceration, opted to take it in the morning because he experienced insomnia as a side effect. *Id*. at ¶¶ 42, 45. However, at the prison, staff provided Mr. Warnock with Effexor in the evening, causing him to suffer insomnia. *Id*. at ¶¶ 45, 46. Mr. Warnock attempted to file a request to receive the medication in the morning, but, unbeknownst to him, made that request through

a channel that IDOC no longer used. *Id*. at ¶¶ 47-53. As a result, no changes were made to the time that staff distributed Effexor to him. *Id*. at ¶¶ 52, 53. Mr. Warnock began "cheeking" the medication, so that he could take it the following morning. *Id*. at ¶¶ 53, 54.

On September 5, 2023, during a cell search, a correctional officer discovered two Effexor pills in Mr. Warnock's possession, a violation of prison rules. *Id*. at ¶¶ 56-57. The officer issued Mr. Warnock a disciplinary offense report for possession of drugs and alcohol. *Id*. at ¶¶ 59-60. As a result, Mr. Warnock's security points were raised, and Defendant Coelho, the Move Coordinator at ISCC, moved Mr. Warnock to G block, a maximum-security unit within ISCC. *Id*. at ¶¶ 7, 65-67.

On September 18, 2023, Defendant Coelho assigned inmate James Johnson ("J.J.")[1] to share a cell with Mr. Warnock. *Id*. at ¶ 81. Defendant Pryor, the Housing Lieutenant at ISCC, signed off on the placement. *Id*. at ¶¶ 8, 82. J.J. was a younger and larger man than Mr. Warnock. *Id*. at ¶ 83-86. J.J. had previously received some undetermined number of disciplinary offense reports for violence against other inmates. *Id*. at ¶ 91. Mr. Warnock, in communications with his family, expressed alarm about J.J. and described his conduct as unstable and rambling. *Id*. at ¶¶ 95-96.

[1] To avoid confusion between Johnson, the Plaintiff, and Johnson, the inmate, the Court will refer to James Johnson as J.J. for the remainder of this decision.

Presumably contemporaneously, Mr. Warnock attempted to get transferred out of G block. *Id*. at ¶ 98. He filed multiple requests to move and "at least one grievance informing officials about the poor conditions on the block and how he did not belong there." *Id*. Mr. Warnock eventually spoke with Defendant Nicodemus, a Captain, "and told him of his desire to move." *Id*. at ¶¶ 9, 100. Nicodemus did not order a move. *Id*. at ¶ 100.

J.J. also sought to move from the cell. J.J. informed Mr. Warnock that they needed to separate "because of the building tension" in their cell, though they could remain friends. *Id*. at ¶ 101. J.J. filled out a move request, which stated, in some form or fashion, "that something bad was going to happen in the cell unless he or Mr. Warnock were moved." *Id*. at ¶¶ 102-03. This request was presented to Defendant Honn, a shift command sergeant, who took no action. *Id*. at ¶¶ 17, 104-05. J.J.'s subsequent follow up inquiries about his request, likewise, resulted in no action. *Id*. at ¶ 106.

On December 10, 2023, the correctional officers on G block, including Defendants Uribe, Tello, Davis, Barrier, and Nebeker, all of whom were assigned to the unit, failed to conduct a required safety or tier check over some period of time lasting between an hour to an hour and forty-five minutes.[2] *Id*. at ¶¶ 10-14, 109. Such checks were supposed to regularly occur at least every thirty minutes.

---

[2] Defendant McKinley was the shift command sergeant that day. *Id*. at ¶¶ 15, 126.

*Id*. at ¶ 111.

During this timeframe, J.J. murdered[3] Mr. Warnock by violently beating him to death over the span of fifteen to twenty minutes. *Id*. at ¶¶ 112-14. The beating, and yelling and screaming by J.J, were audible to inmates in surrounding cells. *Id*. at ¶¶ 113-21. No correctional officers conducted safety checks while the beating occurred. *Id*. at ¶¶ 124-25.

After 11:00 A.M., a correctional officer reported that he saw blood seeping from the cell. *Id*. at ¶ 129. It is unclear approximately how much time had passed between the beginning of the beating and the reporting of blood, though the beating occurring during "mid-morning" hours. *Id*. at ¶ 108. After some time, officers entered the cell and attempted to render medical aid to Mr. Warnock, to no avail. *Id*. at ¶ 133. J.J. stated to officers that he had murdered Mr. Warnock because Mr. Warnock had not respected J.J. as a "gangster" and therefore J.J. "had to show [Mr. Warnock] what's up." *Id*. at ¶ 134.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which

---

[3] J.J. was charged with, and pled guilty to, first-degree murder in *State v. Johnson*, CR01-24-29479.

it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While a complaint attacked by a Rule 12(b)(6) motion to dismiss "does not need detailed factual allegations," it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555. In order to survive a motion to dismiss under Rule 12(b), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. at 557.

The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Id*. "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 1950. Only a complaint that states a plausible claim

for relief survives a motion to dismiss. *Id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## ANALYSIS

### 1. Johnson has Plausibly Alleged Violations of the Eighth Amendment in Claims I, II, and IV as well as partially in Claim III.

A plaintiff must satisfy two requirements to demonstrate that a prison official violated the Eighth Amendment. First, the deprivation alleged must objectively be sufficiently serious. *Farmer*, 511 U.S. at 834. In order to satisfy this objective prong, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id*.

Second, the prison official must subjectively have a sufficiently culpable state of mind. *Id*. In the context of an allegation that conditions within a prison are violative of the Eighth Amendment, the sufficiently culpable state of mind is one of "deliberate indifference" to inmate health or safety. *Id*. Deliberate indifference "entails something more than negligence but is satisfied by something less than acts or omission for the very purpose of causing harm or with knowledge that harm will result." *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013). In order to satisfy the subjective prong, the plaintiff must show that a prison official was deliberately indifferent by "know[ing] of and disregard[ing] an excessive risk to inmate health or safety; the official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer*, 511 U.S. at 837.

*A. Claim I*

Johnson's first claim is that Defendants Coelho and Pryor violated Mr. Warnock's Eighth Amendment rights by authorizing J.J.'s placement in the same cell as Mr. Warnock. Specifically, Johnson alleges that Mr. Warnock faced a substantial risk of serious harm by having "the violent, dangerous, and mentally unstable" J.J. assigned as a cellmate. Amd. Compl. ¶ 143. In her Amended Complaint, Johnson states that:

> 88. [J.J.] was a seven-time convicted felon.
>
> 89. [J.J.] had a history of erratic behavior and likely suffered from mental illness.
>
> 90. [J.J.'s] conduct had gotten increasingly worse in the institution.
>
> 91. He had received several [disciplinary offense reports] for violence against other inmates.
>
> 92. In at least one incident, he acted in concert with members of a Security Threat Group (STG), otherwise known as a prison gang.
>
> 93. In that [disciplinary offense report], an officer labeled him as associating with STG members during an attack on other inmates. [J.J.] had had multiple cellmates.
>
> 94. [J.J.] was known for his history of antagonism, aggressiveness, and bullying towards his cellmates. [J.J's] central file should have had an alert or a flag that he was a violent inmate who should not housed with non-violent inmates. Defendants Coelho, Pryor and John or Jane Does who authorized the placement ignored this violent history.

*Id*. at ¶¶ 88-94.

Additionally, Johnson alleges that G block is a maximum-security unit where each cell houses two inmates who are locked in the cell for up to twenty-three hours per day. *Id*. at ¶¶ 67, 71. Johnson further alleges that G block was understaffed, and that what staff were present were not adequately trained. *Id*. at ¶¶ 77-78.

Here, the allegations are sufficient to plausibly demonstrate that Mr. Warnock was incarcerated under conditions posing a substantial risk of serious harm, as well as that Defendants Coelho and Pryor had knowledge of J.J.'s violent history and disregarded that history.

i. The Objective Prong

The Defendants argue that Johnson has not properly pled the objective prong because Johnson can only show at most a risk of some harm, rather than an objectively substantial risk of serious harm. In support, Defendants rely chiefly upon *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043 (9th Cir. 2002).

However, *Estate of Ford* is limited in applicability here. *Estate of Ford* is a decision on a motion for summary judgment, meaning it had a developed evidentiary record and a differing legal standard than a motion to dismiss. At the pleading stage, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009) (quotation omitted). Though conclusory allegations of

law and unwarranted inferences do not suffice, a complaint need not contain detailed factual allegations but rather plead enough facts to state a plausible claim on its face. *Id*. at 1067-68. Though an increased risk caused by placing J.J. in the same cell as Mr. Warnock may not, in fact, necessarily constitute a substantial risk of serious harm, Johnson's allegations plausibly satisfy the threshold applicable to a motion to dismiss challenge.

Ultimately, at this stage, the Court is not to resolve the ultimate factual question of how substantial the risk actually was—the Court is only to determine whether the pleadings demonstrate that it plausibly rose to the level of sufficiently serious. *See Lemire v. Cal. Dept. of Corrs. and Rehab.*, 726 F.3d 1062, 1075-76 (9th Cir. 2013) ("the objective question of whether a prison officer's actions have exposed an inmate to a substantial risk of serious harm is a question of fact, and as such must be decided by a jury if there is any room for doubt."). The purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of the complaint, *see N. Star Intern. v. Arizona Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). Here, Johnson need only plead facts that plausibly state a claim. There is enough of a factual basis to satisfy the objective prong.

Johnson alleges that Mr. Warnock was assigned an erratic cellmate whose conduct had worsened over his term of incarceration, had been disciplined more than once for violence against other inmates, and was hostile towards his

cellmates. Amd. Compl. ¶¶ 89-91. Mr. Warnock and J.J. shared a small cell that the two were confined in for up to twenty-three hours per day. *Id*. at ¶¶ 71, 81-82. At this stage of a lawsuit, that is sufficient to plausibly allege that Warnock was incarcerated under conditions posing a substantial risk of serious harm.

ii. The Subjective Prong

Johnson must also plausibly plead that Defendants Coelho and Pryor subjectively had a culpable state of mind. "If any of the officers knew that [J.J.] was acting out dangerously with cellmates or that he was a threat to [Warnock] but housed [Warnock] with him anyway, this would violate the Eighth Amendment." *Estate of Ford*, 301 F.3d at 1050. Johnson sufficiently alleges the first of these two possibilities —that officers knew J.J. was acting out dangerously with cellmates. As stated above, Johnson sufficiently alleges that J.J. had an unstable disposition and a history of violence within the prison. Johnson also alleges that Defendants Coelho and Pryor knew and ignored that history. Amd. Compl. ¶¶ 94. Allegations must supply enough underlying facts to provide fair notice and plausibly support relief. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

Considering the entire factual context, Johnson has nudged her claim "across the line from conceivable to plausible." *See Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (quoting *Twombly*, 550 U.S. at 564 n.8). Defendants Coelho and Pryor were the Move Coordinator and Housing Lieutenant, respectively, at

ISCC. Amd. Compl. ¶¶ 7-8. Johnson identifies them as the officials who ultimately facilitated the placement of J.J. and Mr. Warnock in a cell together. *Id*. at ¶¶ 81-82. She also alleges that they both knew and disregarded J.J.'s history while doing so. *Id*. at ¶ 94. Taken together, it is reasonable to infer that these two Defendants knew not only of J.J.'s history of violence, but also of J.J.'s "history of antagonism, aggressiveness, and bullying" towards previous cellmates. This, in turn, supports a reasonable inference that they appreciated the substantial danger created by confining Warnock and J.J. in a shared cell for up to twenty-three hours per day. Thus, Johnson's Amended Complaint plausibly alleges that Defendants Coelho and Pryor disregarded a known substantial risk of serious harm when they made the cell sharing assignment.

As discussed below, Defendants Coelho and Pryor cannot demonstrate, at this stage of the case, that they have qualified immunity.

*B. Claim II*

Johnson next asserts a claim for cruel and unusual punishment against Defendants Honn and Wooten, alleging that those defendants did not protect Mr. Warnock after they were alerted that his housing placement was dangerous.[4]

---

[4] Defendants' motion to dismiss does not include Defendant Gregory Wooten. Defendants state that Defendant Wooten has not been served, and IDOC has never employed anyone by that name. (Dkt. 13-1 4 n.1). Johnson acknowledges that Defendant Wooten was not the individual she intended to name. (Dkt. 14 12 n.1). Accordingly, pursuant to Fed. R. Civ. P. 4(m), the Court will provide Johnson with notice of its intent to dismiss the Amended Complaint (Continued)

The supporting allegations contained in Johnson's Amended Complaint are that Mr. Warnock "sent 'kites' and at least one grievance informing officials about the poor conditions on the block and how he did not belong there."[5] *Id*. at ¶ 98. J.J. also requested a move, and in the request, "warned [prison officials] that something bad was going to happen in the cell unless he or Mr. Warnock were moved." *Id*. at ¶ 103. That request reached Defendant Honn, who ultimately did not move either inmate. *Id*. at ¶¶ 104-07.

The parties first address Mr. Warnock's complaint of poor conditions within G block and assertion that he had been incorrectly placed within the unit. Defendants argue that it cannot reasonably be inferred from Johnson's allegations that Mr. Warnock requested to move due to the threat or fear of physical danger from his cellmate. The Court agrees. *See Labatad v. Corrs. Corp. of America*, 714 F.3d 1155, 1161 (9th Cir. 2013) (no inference that defendants were aware of a substantial risk of harm because plaintiff provided no specifics of a conversation where he stated that he should not be celled with an inmate who later attacked him).

---

as to Defendant Wooten *sua sponte*, absent a showing of good cause or excusable neglect for failure to serve. *See Crowley v. Bannister*, 734 F.3d 967, 974-76 (9th Cir. 2013). The Court's discussion will only concern Defendant Honn.

[5] Johnson also alleges that Mr. Warnock contacted Defendant Nicodemus "and told him of his desire to move." Amd. Compl. ¶ 100. However, Defendant Nicodemus was not named in this claim.

The parties then focus on J.J.'s move request, in which he is alleged to have informed Defendant Honn that something bad would happen if he and Mr. Warnock were not separated. The parties largely reiterate their arguments made in Claim I. Thus, the Court will simply note that Claim II involves an additional fact—that J.J. made a move request containing a statement that something bad would happen if he and Mr. Warnock were not separated. This, coupled with the fact that J.J. had been disciplined for violence in the prison more than once, allows for a reasonable inference that J.J.'s warning contemplated violence against his cellmate, even if he had told Mr. Warnock that they could remain friends. Thus, Johnson has plausibly pled that the conditions of Mr. Warnock's incarceration presented an objective risk of serious harm.

Johnson pleads facts sufficient to plausibly demonstrate success on proving the subjective prong. The Defendants argue that Johnson's allegation that J.J.'s move request warned prison officials "that something bad was going to happen in the cell unless he or Mr. Warnock were moved" is too vague to infer what that bad action would be. Johnson argues that, in the context of a maximum-security unit such as G block, such a warning from an inmate with a known history of violence within the prison, it is reasonable to infer that J.J.'s warning contemplated violence against his cellmate. "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible,

plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr,* 652 F.3d at 1216.

Taking the factual allegations as true and construing the pleadings in the light most favorable to Johnson, there is a reasonable inference that Sergeant Honn, a shift command sergeant and a housing sergeant for G block, received J.J.'s warning. This, coupled with the reasonable inference that the warning provided by an inmate with a known history of violence, suffices to plausibly allege that Sergeant Honn knew of, and disregarded, the need to move J.J. and Mr. Warnock to separate cells.

As discussed below, Defendant Honn cannot demonstrate, at this stage of the case, that he has qualified immunity. The motion to dismiss is denied as to Claim II.

*C. Claim III*

Johnson's third claim is that Defendants Valley and McKinley violated Mr. Warnock's Eighth Amendment rights by failing to ensure adequate staffing and training on G block. In her Amended Complaint, Johnson asserts that:

> 73. Idaho has one of the highest per-capita rates of incarceration in the United States, and the Idaho Department of Correction's facilities are critically understaffed.
>
> 74. This is true in G block at ISCC.
>
> 75. The Warden, Randy Valley, was required to ensure adequate

> staffing at ISCC and in G block particularly.[6]
>
> 76. The critical understaffing was an open and obvious problem, yet neither Warden Valley nor any other IDOC employee acting within the course and scope of their employment corrected it.
>
> 77. More specifically, the Idaho Department of Correction did not staff G block with an adequate number of correctional officers to ensure the safety of that special housing unit.
>
> 78. The Idaho Department of Correction also did not train its G block staff adequately to keep inmates safe in its dangerous environment.
>
> 79. Due to the combination of the high-risk population housed in G block, chronic understaffing, and the dangerous housing conditions, Defendants were aware that there was a serious risk of violence there, yet they were deliberately indifferent to the risk.

*Id.*

"[A] prison official in a supervisory position may be held liable under §1983 if he was personally involved in the constitutional deprivation or a sufficient causal connection exists between his unlawful conduct and the constitutional violation." *Lemire*, 726 F.3d at 1085 (citation omitted). "A showing that a supervisor acted, or failed to act, in a manner deliberately indifferent to an inmate's Eighth Amendment rights is sufficient to demonstrate the involvement—and the liability—of that supervisor." *Starr*, 652 F.3d. at 1206-07.

i. Staffing

[6] Later in the Amended Complaint, Johnson alleges that Defendant McKinley was the shift command sergeant on December 10, 2023, and was responsible for ensuring sufficient staffing on G Block. Amd. Compl. ¶ 126.

"Inadequate staffing can create an objective risk of substantial harm in a prison setting that is sufficient to satisfy the objective prong of the deliberate indifference test." *Lemire*, 726 F.3d at 1076. Though understaffing itself does not automatically violate the Eighth Amendment, if "that understaffing both places an inmate at a substantial risk of serious harm and resulted from prison officials' deliberate indifference, those officials will be liable under § 1983." *Wolf v. Tewalt*, 2021 WL 5132423 at *9 (D. Idaho Nov. 3, 2021). Johnson alleges the dangerous conditions of G block. Amd. Compl. ¶¶ 66-72. She also alleges that the unit was chronically understaffed, to the point that it was an open and obvious problem. *Id*. at ¶¶ 73-76. Read together with her allegations that no appropriate tier check occurred for an hour to an hour and forty-five minutes, there is support for a reasonable inference that the understaffing contributed to the lapse in monitoring. This explanation need only be plausible at this stage. *See Starr*, 652 F.3d at 1216-17. Additionally, "it is enough for the [plaintiff] to demonstrate that he was exposed to a substantial risk of some range of serious harms; the harm he actually suffered need not have been the most likely result among this range of outcomes. *Lemire*, 726 F.3d at 1076. Thus, Mr. Warnock was plausibly exposed to a substantial risk of serious violence.

For the subjective prong, Johnson must plausibly allege that each Defendant knew of and disregarded a substantial risk of serious harm. She need not allege that

either Defendant anticipated harm would specifically befall Mr. Warnock; awareness of a substantial risk to inmates in his situation is sufficient. *Lemire*, 726 F.3d at 1077-78. Such awareness may be inferred from circumstantial facts, including the obviousness of the risk. *Farmer*, 511 U.S. at 843.

Johnson alleges that Defendant Valley was responsible for staffing at ISCC—including G block. Amd. Compl. ¶¶ 6, 75. The understaffing of G block was allegedly chronic, open and obvious. *Id*. at ¶ 76. Yet, it remained uncorrected. *Id*. This alleged ongoing, severe staffing shortage, coupled with Valley's responsibility and oversight of it, supports a reasonable inference that he actually knew of it. Given the condition of G block and the types of inmates housed in it, it is plausible that Valley appreciated the substantial danger attendant to the understaffing and nevertheless permitted the condition to continue.

Johnson alleges that Defendant McKinley was the shift command sergeant the day that Mr. Warnock was murdered. *Id*. at ¶ 126. He was responsible for ensuring that G block was sufficiently staffed, so that the officers could conduct tier checks in accordance with the required frequency. *Id*. Johnson alleges that he failed to do so. *Id*. at ¶ 127. There is a reasonable inference that Defendant McKinley knew G block was insufficiently staffed to meet the unit's specific needs and opted to proceed with fewer officers than needed—putting inmates at a substantial risk of serious harm. There is in turn an inference that this inadequate

staffing was the reason for the missed tier checks. In total, the allegations plausible support an inference that Defendant McKinley knowingly permitted inadequate coverage despite the resulting danger.

Whether either Defendant lacked awareness of the insufficient staffing or took reasonable protective measures is a question that may be answered by discovery. However, at this stage, Johnson's allegations need only be plausible. Accordingly, Johnson sufficiently alleges the subjective prong.

ii. Training

Johnson also asserts that Defendant IDOC did not adequately train its G block staff. This theory is insufficiently pled. "The inadequacy of training may serve as a basis for liability under [S]ection 1983 where the failure to train amounts to deliberate indifference to the rights of persons with whom the subordinates come into contact." *Rojas by and through Rojas v. Cal. Dept. of Corrs. and Rehab.*, 2025 WL 2552612 (E.D. Cal. Sep. 4, 2025) (citation omitted). Johnson must show that Defendants were deliberately indifferent to the need to train their subordinates, and the lack of training actually caused the harm or deprivation. *Flores v. Cnt'y of Los Angeles*, 758 F.3d 1154, 1158-59 (9th Cir. 2014).

Here, Johnson alleges that IDOC "did not train its G block staff adequately to keep inmates safe in its dangerous environment. Amd. Compl. ¶ 78. But there are no allegations that explain what training was, or was not, provided to G block

staff. Without any factual allegations fleshing out these alleged training inadequacies, the Court is unable to evaluate whether this claim plausibly demonstrates that such inadequacies created a substantial risk of serious harm.

Additionally, the Amended Complaint also lacks facts supporting a plausible allegation that Defendants Valley or McKinley were deliberately indifferent to inmate health or safety. While Johnson alleges that Defendants were aware of the "serious risk of violence" in G block stemming from the combination of a high-risk inmate population, understaffing, and dangerous housing conditions, these allegations do not explain how either Defendant became aware that staff lacked necessary training.

Finally, the "failure to identify a training deficiency with specificity defeats liability on a failure to train theory." *Rojas by and through Rojas*, 2025 WL 2552612 at *6. The allegations that the staff on G block failed to perform a safety check as required do not suffice to establish a training deficiency with specificity. *Cf. Perez v. Cox*, 788 Fed. Appx. 438, 440-41 (9th Cir. 2019) (affirming denial of motion to dismiss complaint containing allegations that supervisory defendants trained subordinates to use live ammunition to maintain order within a prison).

Accordingly, Johnson plausibly alleges an Eighth Amendment claim against Defendants Valley and McKinley based on inadequate staffing but does not adequately plead liability based on inadequate training. As discussed below,

Defendants Valley and McKinley cannot demonstrate that they have qualified immunity regarding the inadequate training portion of this claim. The motion to dismiss is granted in part as to Claim III.

*D. Claim IV*

Johnson's fourth claim is that Defendants Uribe, Nebeker, Tello, Barrier, and Davis failed to protect Mr. Warnock by not performing tier checks with the required frequency, resulting in J.J. beating Mr. Warnock to death without intervention over a significant period of time. In their briefing, the parties argue the objective prong, whether the missed cell check is sufficiently supported by well-pled facts to plausibly demonstrate that there was a substantial risk of serious harm. Defendants cite an unpublished Ninth Circuit memorandum disposition, *Estate of Sumner v. Cal. Dept. of Corrs. and Rehab.*, 2025 WL 416816 (9th Cir. 2025). In this case, plaintiff's estate brought a failure to protect claim, claiming that prison officials were deliberately indifferent to a substantial risk of serious harm by placing the plaintiff in a cell with "a notoriously violent and unrepentant inmate." *Id*. at *1. In a footnote, the Ninth Circuit noted that plaintiff's complaint alleged that defendants "failed to 'conduct routine cell-checks' and that their failure to do so 'demonstrated their deliberate and obvious indifference to [plaintiff's] serious safety needs.'" *Id*. at *1 n. 2. Examining the allegation, the Ninth Circuit noted that "[p]laintiff's broad allegation that [defendants] failed to

conduct 'routine cell-checks' is devoid of any factual detail that would permit us to draw an inference of deliberate indifference." *Id*.

Johnson points to *Lemire*. In *Lemire*, all prison officials, other than a control booth officer who could not see into most cells from his station, left the building housing inmates with psychiatric illnesses for up to three and a half hours to attend a staff meeting. 726 F.3d at 1070-71. During that timeframe, an inmate committed suicide. *Id*. at 1071-72. The Ninth Circuit vacated a grant of summary judgment in defendants' favor on the claim that the removal of officers from the building was a violation of the Eighth Amendment, finding that there were triable issues as to whether the withdrawal of officers created an objective substantial risk, and whether the risk was subjectively obvious, or defendants were aware of the risks. *Id*. at 1076-79.

i. The Objective Prong

As to the objective prong, Johnson's Amended Complaint contains more factual detail than that relayed by the Ninth Circuit in *Estate of Sumner*. While in both *Estate of Sumner* and this case the victim shared a cell with an inmate with a known violent history, the comparison cannot extend any further. Johnson alleges that G block was a maximum-security unit where inmates were locked in cells together for up to twenty-three hours. Amd. Compl. ¶ 71. She alleges that it was inadequately staffed. *Id*. at ¶¶ 73-77. Whether the plaintiff in *Estate of Sumner*

provided additional contextual allegations such as these is not apparent from the memorandum decision. The additional facts that Johnson alleged regarding the conditions of G block, coupled with the prolonged lapse in adequate supervision, plausibly illustrate circumstances that posed a substantial risk of serious harm.

ii. The Subjective Prong

Each Defendant must have actually recognized and disregarded the substantial risk. *Farmer*, 511 U.S. at 834. Though the Court may infer awareness from circumstantial evidence, "[i]t is not enough merely to find that a reasonable person would have known, or that the defendant should have known." *Id.* at 843 n.8. A prison official must "disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837.

Johnson does not have to allege that J.J. would assault Mr. Warnock specifically. Rather, the appropriate inquiry is whether Defendants—Uribe, Nebeker, Tello, Barrier, and Davis—were aware that failing to conduct tier checks within, at most, thirty-minute intervals would pose a substantial risk of serious harm to someone in Mr. Warnock's situation, not necessarily to Mr. Warnock himself. *See id*. at 843; *Lemire*, 726 F.3d at 1077-78 (whether supervisory defendants were aware that removing all floor officers from a unit for three and a

half hours would pose such a risk to someone in the decedent's situation).

Johnson asserts that Defendants were assigned to G block on the day of Mr. Warnock's murder. Amd. Compl. ¶ 109. As discussed earlier, the Amended Complaint alleges that G block is a maximum-security unit where inmates may be confined for up to twenty-three hours per day. *Id.* at ¶ 71. There are two inmates to each cell. *Id*. G block allegedly was understaffed. *Id*. at ¶ 77. Officers—such as Defendants—were required to make scheduled and unscheduled tier checks at least every thirty minutes. *Id.* at ¶¶ 110-11. During these checks, Defendants were allegedly required to look into the cells and confirm that all inmates were living and breathing. *Id*. at ¶ 110. Johnson identifies these Defendants as officers who failed to perform a tier check for an hour to an hour and forty-five minutes. *Id*. at ¶¶ 109, 125.

The Defendants' assignment to G block, the protective function of the tier checks, and the extended period during which those checks were allegedly not performed provide factual support for Johnson's allegation that they were aware of the substantial risk. *See Farmer*, 511 U.S. at 842 ("a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."). There is a reasonable inference that they allowed the lapse to occur even though they understood the danger that it posed to inmates confined within shared cells in G block. Given the purported conditions in G block and the inmate

safety purpose of the tier checks, there is a plausible allegation that Defendants acted with deliberate indifference.[7]

As discussed below, Defendants Uribe, Nebeker, Tello, Barrier, and Davis cannot demonstrate that they have qualified immunity for this claim. The motion to dismiss is denied as to Claim IV.

### 2. The Defendants Are Not Entitled to Qualified Immunity at the Pleading Stage.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

An official's conduct violates clearly established law when the contours of a

[7] The Defendants argue that in *Estate of Sumner*:

> conclusory allegations that defendants celled plaintiff with a "notoriously violent and unrepentant inmate" about whom it was "known" that he was incarcerated for shooting a close friend did not state a deliberate indifference claim absent facts showing defendants knew of existing animosity between the cellmates or that the cellmate posed a specific threat to plaintiff.

Dkt. 13-1 at 17-18. However, discussed above, *Estate of Sumner* is only of limited use here. The Ninth Circuit characterized the allegations of missed routine checks as "devoid of any factual detail that would permit us to draw an inference of deliberate indifference." *Estate of Sumner*, 2025 WL 416816 at *1 n.2. The memorandum does not describe the conditions or unit that the plaintiff was housed in, the required frequency of the checks, or the duration of the lapse. While none of those elements necessarily provide a bright-line determination of whether deliberate indifference can be inferred, Johnson does provide allegations that allow the Court to consider Defendants' alleged failure to conduct a tier check within their factual context.

right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right. *Id*. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Though there does not have to be a case directly on point, the existing precedent must place the statutory or constitutional question beyond debate. *Id*. Case law must have been developed to such a concrete and factually defined context to make it obvious to all reasonable government actors that what he is doing violates federal law. *Shafer v. Cnt'y of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017).

Though the plaintiff bears the burden of showing that the rights alleged to have been violated were clearly established, Courts are not restricted only to cases identified by the plaintiff. *Gordon v. Cnt'y of Orange*, 6 F.4th 961, 969 (9th Cir. 2021).

"When, as here, defendants assert qualified immunity in a motion to dismiss under Rule 12(b)(6), 'dismissal is not appropriate unless [the Court] can determine, based on the complaint itself, that qualified immunity applies.'" *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016) (quoting *Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001). The Court is to determine whether the complaint alleges sufficient facts, taken as true, to support the claim that the officer's conduct violated clear "If the operative complaint contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right, then

plaintiffs are entitled to go forward with their claims. *Keates v. Koile*, 883, F.3d 1228, 1235 (9th Cir. 2018) (internal quotation omitted). If qualified immunity is denied at the pleading stage, a defendant may later move for summary judgment based upon the doctrine. *O'Brien*, 818 F.3d at 936.

*A. Claim I*

Defendants Coelho and Pryor are not entitled to dismissal due to qualified immunity at this stage.

The right at issue is Mr. Warnock's right not to be assigned a shared cell with an inmate known to have a history of violence, as well as antagonism towards cellmates. If any officers know that an inmate is acting out dangerously with cellmates, celling that inmate with another is a violation of the Eighth Amendment. *Estate of Ford*, 301 F.3d at 1050.

Johnson alleges that J.J. had a known history of violence and antagonistic behavior, and that his conduct had worsened over the span of his incarceration. Amd. Compl. ¶¶ 90-91, 94. As discussed above, those allegations support a reasonable inference that Defendants knew of J.J.'s history and behavior and nevertheless authorized his placement with Mr. Warnock. Read in a light favorable to Johnson, these allegations describe a celling assignment made despite a known, continuing danger stemming from J.J.'s behavior within the prison.

Defendants argue that *Estate of Ford* supports a finding of qualified

immunity because the Amended Complaint does not plausibly allege that a reasonable officer would have been on notice that his conduct violated the Eighth Amendment under circumstances where a specific threat to Mr. Warnock or allegations that J.J. was currently violent were absent.

However, *Estate of Ford* again has distinguishing facts that prevent it from being directly translated onto this case. In *Estate of Ford*, the attacking inmate had been previously celled with other inmates, including the decedent, without issue. 301 F.3d at1046. Both inmates expressed a willingness to be celled together. *Id*. at 1047. The attacking inmate had been unmedicated when he previously attacked a cellmate, and at the time that he and the decedent were celled together, had been placed back on medication. *Id*. at 1051. These facts, which were fully developed at the summary judgement stage, mean that *Estate of Ford* is not an exact analogue to the facts here. Therefore, *Estate of Ford* does not necessitate the Court to conclude that it was not clear to Defendants Coelho and Pryor that the cell assignment was a violation of Mr. Warnock's rights.

*B. Claim II*

Johnson has plausibly alleged that Defendant Honn failed to protect Mr. Warnock after receiving notice of J.J.'s threat in his move request. The right at issue was the right to reasonable protective measures when an official knows that continued exposure to a particular inmate creates a substantial risk of serious harm.

This right was clearly established at the time of Mr. Warnock's murder. In *Wilk v. Neven*, an inmate reported to prison officials that another inmate had threatened to kill him. *Wilk v. Neven*, 956 F.3d 1143, 1146 (9th Cir. 2020). The officials moved the inmate into the same unit as the one that had threatened him. *Id*. That inmate attempted to make good on the threat and physically beat the reporting inmate. *Id*. The Ninth Circuit had "recently addressed clearly established Eighth Amendment Law with respect to failure-to-protect claims . . . . Once an official is subjectively aware of a substantial risk of serious harm, 'clearly established' law requires 'only that the [official] take reasonable measures to mitigate the substantial risk." *Id*. at 1148-49 (quoting *Castro v. City of Los Angeles*, 833 F.3d 1060, 1067 (9th Cir. 2016)). The Ninth Circuit reversed the district court's grant of qualified immunity to the officials, finding that the officials had been made aware of the attacking inmate's threat and failed to respond reasonably to the threat by placing the two inmates in the same unit and failing to document the threat. *Id*. at 1150. "Any reasonable prison official in the defendants' position would know that the actions defendants took, and failed to take, violated the Eighth Amendment." *Id*.

As discussed above, *Estate of Ford* has additional facts that distinguish it from Johnson's case. The exact warning that J.J. provided in this case is still unknown. But, reading the Amended Complaint in the light most favorable to

Johnson and drawing all reasonable inferences, it is plausible that J.J.'s warning put Defendant Honn on notice of the threat to Mr. Warnock. Johnson's pleadings contain an allegation of a harmful act that would constitute a violation of a clearly established constitutional right and is therefore entitled to continue forward with this claim. *Keates*, 883 F.3d at 1235 (internal citation omitted).

*C. Claim III*

Johnson has plausibly alleged an Eighth Amendment violation arising from inadequate staffing, though not from inadequate training. The Court must determine whether Defendants' alleged conduct was violative of a clearly established right.

In *Hoptowit v. Ray*, the Ninth Circuit stated that "[c]ourts may require prison officials to hire a sufficient number of guards to meet safety needs, depending on the number of prisoners and the structure of the prison." 682 F.2d 1237, 1251 (9th Cir. 1982) *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). *Lemire* later recognized that "[i]nadequate staffing can create an objective risk of substantial harm in a prison setting that is sufficient to satisfy the objective prong of the deliberate indifference test." 726 F.3d at 1076.

As discussed earlier, in *Lemire*, all prison officials, other than one stationed where he could not see most cells, left the psychiatric unit for up to three and a half hours to attend a staff meeting. *Id.* at 1070-71. During that timeframe, an inmate

committed suicide. *Id*. at 1071-72. The Ninth Circuit vacated a grant of summary judgment in defendants' favor on plaintiff's claim that the removal of officers from the building was a violation of the Eighth Amendment, finding that there were triable issues as to whether the withdrawal of officers created an objective substantial risk, and whether the risk was subjectively obvious, or defendants were aware of the risks. *Id*. at 1076-79

Johnson's allegations similarly concern inadequate supervision of a particularly sensitive prison population that presents a heightened level of danger. She alleges that Defendants Valley and McKinley allowed significant, ongoing staffing shortages of G block to continue unabated. Amd. Compl. ¶¶ 75-76, 126-27. This understaffing plausibly impacted the correction officers' ability to properly monitor the unit. As discussed above, there is a reasonable inference that these Defendants appreciated the substantial danger and that the inadequate staffing contributed to the lapse in monitoring on the morning that Mr. Warnock was murdered.

The factual differences between Johnson's allegations and *Lemire* are not so distinct as to preclude her inadequate staffing from falling outside of the "contours of the right." *al-Kidd*, 563 U.S. at 741. Although a case not directly on point is unnecessary, precedent must place the constitutional question beyond debate. *Id*. *Hoptowit* and *Lemire* plausibly establish that Defendants could not knowingly

ignore critical staffing deficiencies when those exposed inmates to substantial danger of serious harm. *Wilk*, 956 F.3d at 1148.

*D. Claim IV*

The Plaintiff has not provided the Court with any relevant case in the Ninth Circuit holding that a failure to conduct wellness checks with the frequency required by IDOC in G Block, by itself, rises to the level of deliberate indifference. However, the law does not require there be a case directly on point in order to avoid qualified immunity. Rather, plaintiff's burden is only to show that the existing precedent place the statutory or constitutional question beyond debate, so that all reasonable government actors can understand that what they are doing violates federal law. *Shafer v. Cnt'y of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017).

In this case, the thirty-minute safety check requirement cannot be viewed in the abstract. It is a fair inference that the requirement was tied to the nature of that facility. The Amended Complaint alleges that G Block (1) was a maximum security unit, (2) where the most difficult inmates to manage are housed, (3) is a "harsh, monotonous, and dangerous" housing unit, and (4) has its inmates locked in an 8" x 10" cell with a cellmate for up to twenty-three hours a day. Amd. Compl. ¶¶ 66-71. Under these potentially explosive conditions, IDOC imposed a rigorous and appropriate requirement of frequent safety checks. It is also a

reasonable inference that the need for strict compliance with these requirements was obvious to all employees.

The Ninth Circuit's decision in *Lemire* underscores this point. In *Lemire,* the floor officers' Post Orders required security checks at least hourly during the day. 726 F.3d at 1070. The staff's multi-hour absence, the Circuit concluded, created an objectively substantial risk to the unsupervised inmates. *Id*. at 1076-77. Critical to the Circuit's decision was that most of the inmates in the housing unit in question were mentally ill, and the unit had an acute problem with inmate suicides and violence. *Id*. at 1069, 1076-77. It is true that the delay in making the security check in this case was less than that in *Lemire*—up to one hour and forty-five minutes versus up to three and a half hours. But so was the allowed time between safety checks—thirty minutes versus one hour. And that is critical to any analysis, since it reflects the prison administration and staff's perception of the dangers posed for unsupervised inmates housed in that housing unit of the prison.

From the holding in *Lemire*, the Court concludes that it was clearly established law in the Ninth Circuit that the failure to comply with safety check standards in prison housing units with heightened safety concerns, create an objectively substantial risk to an inmate in Warnock's situation. And Johnson has adequately alleged that Defendants were deliberately indifferent to that risk, in that they knew of the substantial risk of serious harm and disregarded it. At the

pleading stage, nothing more is required. The Court therefore concludes that Defendants Uribe, Nebeker, Tello, Barrier, and Davis are not entitled to qualified immunity.

**3. Claim V is Partially Dismissed Under the Various Defenses Raised by Defendants.**

Johnson's fifth claim, directed at all Defendants, is for wrongful death.[8] This claim is brought pursuant to the Idaho Tort Claims Act, Idaho Code § 6-901 *et seq*. ("ITCA"). "The ITCA establishes that governmental entities are subject to liability for their own negligent or wrongful acts, and those of their employees who were acting within the course and scope of their employment." *Hoffer v. City of Boise*, 257 P.3d 1226, 1228 (Idaho 2011).

Defendants move to dismiss this claim under four different theories: 1) Johnson's statutorily-required Notice of Tort Claim failed to meet the requirements of I.C. §§ 6-905 and -908; 2) her pleadings violate Fed. R. Civ. P. 8 by engaging in impermissible group pleading; 3) Defendants are statutorily immune under I.C. § 6-904A; and 4) Defendants are immune under the ITCA's discretionary function exception.

*A. Notice of Tort Claim*

[8] Johnson concedes that IDOC, as an organ of the state, is immune from this claim under the Eleventh Amendment. (Dkt. 14 15-16). The Court will therefore dismiss IDOC from this suit with prejudice.

Defendants first argue that Johnson's state law claim should be dismissed against all of them, except Valley, because Johnson named only Valley in her Notice of Tort Claim.

"All claims against the state . . . and all claims against an employee of the state for any act or omission of the employee within the course or scope of his employment shall be presented to and filed with the secretary of state within one hundred eighty (180) days . . . ." I.C. § 6-905. A claim or action against a governmental entity or its employee is barred unless the claim has been presented and filed within the time limit prescribed by the ITCA. *Id*. at § 6-908. Compliance with the notice requirement "is a mandatory condition precedent to bringing suit, the failure of which is fatal to a claim, no matter how legitimate." *McQuillen v. City of Ammon*, 747 P.2d 741, 744 (Idaho 1987).

The contents of a notice are governed by I.C. § 6-907. This provision requires the notice to:

> accurately describe the conduct and circumstances which brought about the injury or damage, describe the injury or damage, state the time and place the injury or damage occurred, state the names of all persons involved, if known, and shall contain the amount of damages claimed, together with a statement of the actual residence of the claimant at the time of presenting and filing the claim and for a period of six (6) months immediately prior to the time the claim arose . . . . A claim filed under the provisions of this section shall not be held invalid or insufficient by reason of an inaccuracy in stating the time, place, nature or cause of the claim, or otherwise, unless it is shown that the governmental entity was in fact misled to its injury thereby.

*Id*.

Johnson filed her notice with the Secretary of State on May 10, 2024—within 180 days of Mr. Warnock's death. In her notice, Johnson explicitly listed Defendant Valley. She also stated that "[a]ll of the names of the people and entities involved in Milo Warnock's wrongful death are not known at this time. Parties to be included in this case include the State of Idaho, Idaho Department of Corrections, [and] its employees, contractors, and agents[.]" Defs.' Mot. Dismiss Ex. 1, Notice of Tort Claim at 2 (Dkt. 13-3). Other information required by Section 6-907, including the conduct and circumstances, the injury, and the time and place, is included. *Id*. at 3-4.

"Interpretation of a statute begins with an examination of the statute's literal words. Where the language of a statute is plain and unambiguous, courts give effect to the statute as written, without engaging in statutory construction." *Idaho Conservation League, Inc. v. Idaho Dept. of Agric.*, 146 P.3d 632, 634 (Idaho 2006). "When determining the plain meaning of a statute, effect must be given to all the words of the statute if possible, so that non will be void, superfluous, or redundant." *Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 265 P.3d 502, 510 (Idaho 2011) (internal quotation omitted).

Johnson's notice complies with Section 6-907. Section 6-907 requires that the notice "state the names of all persons involved, *if known*" (emphasis added). Dismissal of Johnson's ITCA claim because Defendants other than Valley were

not explicitly named, but instead referenced in a general "employees, contractors, and agents" catch-all would render that provision of the statute superfluous. Johnson's notice was timely filed, alerted the governmental entity, IDOC, to the nature of her claim, and was not otherwise deficient. Therefore, her claim against Defendants was presented and filed in compliance with Sections 6-905 and -908. The Court will not dismiss Claim V on this basis.

*B. Group Pleading*

Defendants also argue that Johnson violated Fed. R. Civ. P. 8(a)(2)'s requirement of a short and plain statement showing that she is entitled to relief by engaging in impermissible shotgun pleading.

A shotgun pleading is a pleading that indiscriminately incorporates assertions from one claim to another, preventing the opposing party from being able to prepare a response—or simply making the burden of doing so more difficult. *Gibson v. City of Portland*, 156 F.4th 1265, 1288 (9th Cir. 2026) (quoting 5A *Wright & Miller's Federal Practice and Procedure* § 1326 (4th ed. 2024)). One species of shotgun pleading is a complaint that asserts multiple claims against multiple defendants but fails to specify which defendant is responsible for which acts or omissions, or which of the defendants the claim is brought against. *Id*. (quoting 35 C.J.S. *Fed. Civ. Proc.* § 310 (2025)). "'Shotgun pleading' describes a class of defects in complaints; it does not supply a brightline rule. It will require

judgment on the part of the district courts to determine those complaints that fail to provide . . . sufficient notice of the claims and their basis." *Gibson*, 165 F.4th at 1289-90.

Some of Johnson's allegations in Claim V are clearly analogous to her federal claims and their accompanying facts. For instance, paragraphs 179-183 allege insufficient staffing, authorizing J.J.'s placement in Mr. Warnock's cell, not moving J.J. and Mr. Warnock to separate cells, and not appropriately conducting tier checks. The Court will not dismiss these allegations as violative of Rule 8. While Johnson could have more precisely pleaded her claim by naming Defendants that each of those allegations are levied at, the entirety of the Amended Complaint makes it clear for those above-specified paragraphs which Defendants are alleged to have done what.

However, a portion of her ITCA claim cannot be easily matched to the facts supporting her Section 1983 allegations. These are found in paragraphs 176-178.[9] These paragraphs allege that Defendants lacked policies, practices, and customs for separating violent and non-violent inmates in housing assignments, assessing the mental health of potential cellmates, and assessing the specific facts underlying a

[9] In Claim V, Johnson also alleges that Defendants failed to "expeditiously provide life saving measures." Amd. Compl. ¶ 184. This allegation falls between the poles of those allegations that can be linked to the relevant Defendants and those that cannot. The Court will not address it here, as all Defendants have immunity as to this allegation under I.C. §6-904A.

disciplinary offense before moving an inmate to a higher-security unit. "It is not the job of the district courts to make sense of the pleading, [or] to supply facts to support the claim[.]" *Gibson*, 165 F.4th at 1289.

Nowhere in her fact section or her federal claims for relief does Johnson levy any allegations regarding such policies. Permitting these allegations as pleaded to stand would force Defendants to try to theorize who exactly they may apply to without any indication in earlier portions of the Amended Complaint. Claim V is dismissed to the extent that it seeks to impose lability on Defendants for allegedly failing to either establish or follow the policies, practices, and customs described in paragraphs 176-178. This dismissal is without prejudice, and the Plaintiff may seek leave to amend to fill in the gaps in her claims.

*C. Idaho Code § 6-904A Immunity*

Idaho Code § 6-904A(2) provides immunity to government employees acting within the course and scope of their employment from claims that arise out of injury by a "person under supervision, custody or care of a governmental entity" so long as the employees' conduct is not reckless, willful and wanton. I.C. § 6-904A(2). "'Reckless, willful and wanton conduct' is present only when a person intentionally and knowingly does or fails to do an act creating unreasonable risk of harm to another, and which involves a high degree of probability that such harm will result." I.C. § 6-904C(2). Such conduct is present when a person knows or has

reason to know facts which would lead a reasonable individual to realize his conduct not only creates an unreasonable risk of harm but also involves a high degree of probability that such harm would result. *Harris v. Dep't. of Health & Welfare*, 847 P.2d 1156, 1160 (Idaho 1992). "The key element of this definition is a type of knowledge that implies an element of foreseeability." *Farnworth v. Ratliff*, 999 P.2d 892, 894 (Idaho 2000). "[W]hether a risk of harm is foreseeable is generally a question for the trier of fact." *Hunter v. Dep't of Corrs.,* 57 P.3d 755, 760 (Idaho 2002) (internal quotation omitted).

"Idaho Code § 6-904A(2) was intended to render the state immune from the *unpredictable* acts of third persons, including . . . persons under the state's custody, supervision, or care." *Harris,* 847 P.2d at 1160 (emphasis original). "The specific harm . . . must be manifest or ostensible, and highly likely to occur." *Id*. The specific kind of harm must be foreseeable—not the specific mechanism. *Mattson v. Idaho Dept. of Health and Welfare*, 529 P.3d 731, 743 (Idaho 2023).

For instance, in *Harris*, a juvenile with a criminal history of four misdemeanors was placed in the care and custody of the Idaho Department of Health and Welfare, though he was living with his parents. *Harris*, 847 P.2d at 1158. The Department completed a psychological evaluation of the juvenile, which indicated that he had a proclivity to aggression and potentially posed an above average threat of sexual violence to female peers. *Id*. The Department

subsequently lost contact with the juvenile, who then committed a burglary and violent rape of an elderly woman. *Id*. The Idaho Supreme Court affirmed summary judgment in favor of the Department, finding that:

> there is no evidence in the record to indicate that the state's employees intentionally and knowingly did or failed to do any act which created an unreasonable risk of harm to [the victim]. Specifically, no act or omission of the employees involved a high degree of probability that *the kind of harm which [the victim] suffered would result therefrom*."

*Id*. at 1160 (emphasis original). By contrast, in *Smith*, the Supreme Court reversed a grant of summary judgment in favor of defendants, determining that there was sufficient evidence that a jury could find the state's conduct to be reckless, willful and wanton where inmates supervised by a state employee suffered hand injuries while operating table saws that had their safety guards removed, and the evidence permitted an inference that the employee knew that the guards had been removed. *Smith*, 988 P.2d at 1198.

A plaintiff "may prove liability by showing either that the [defendant] acted with malice or criminal intent or that the [defendant's] action was reckless, willful and wanton." *Hunter*, 57 P.3d at 759. Johnson must allege facts that, accepted as true and construed in her favor, plausibly support an inference that Defendants' conduct was reckless, willful and wanton, as defined by the statute.

In *Stacey v. Cnt'y of Madison*, this District dealt with a motion to dismiss under Section 6-904A. The Court determined factual allegations that jail officials

knew or had reason to know of an inmate's violent tendencies and nevertheless classified him as a medium-security inmate "support[ed] an inference that Defendants' conduct was reckless." 2024 WL 3677243 at *4 (D. Idaho Aug. 6, 2024). Though the complaint was ultimately dismissed on other grounds, the Court considered its allegations sufficient to avoid dismissal under Section 6-904A.

i. Authorizing the Housing and not Moving Either Inmate

The Court considers the allegations that Defendants authorized J.J. to be housed with Mr. Warnock and then did not move either to a different cell to be comparable to those in *Stacey*. Like the attacking inmate in *Stacey*, J.J. also had a history of violence against other inmates within the prison. Amd. Compl. ¶ 91. Johnson alleges that Defendants Coelho and Pryor knew this and still placed J.J. in a shared cell with Mr. Warnock. *Id*. at ¶¶ 81-82, 94. She further alleges that Defendant Honn received a warning from J.J. that something bad would happen if he and Mr. Warnock were not separated and still took no action. *Id*. at ¶¶ 103-106. Considering *Stacey* as a persuasive guidepost, Johnson has adequately pled the reckless, willful and wanton exception.

ii. Inadequate Staffing and Training

Johnson also sufficiently alleges reckless, willful and wanton conduct in connection to inadequately staffing G block or training the officers present there. The staffing shortage on G block was allegedly chronic, open, and obvious. *Id*. at

¶¶ 73-76. On the day of Mr. Warnock's murder, tier checks allegedly did not occur within every thirty minutes as required. *Id*. at ¶ 109. There is a reasonable inference that the staffing shortage impacted the officers' ability to properly monitor G block, and that Defendants knowingly permitted that situation to continue.

Defendants argue that Johnson must establish the foreseeability of murder, rather than that of J.J. committing violence against another inmate. That argument amounts to unjustified hairsplitting, when applied to the circumstances here. Foreseeability concerns the particular kind of harm. *Mattson*, 529 P.3d at 743. The relevant danger here is a physical assault by one cellmate upon another without timely intervention. The Court is not persuaded that Mr. Warnock's death must be categorized as an entirely different kind of harm simply because the physical violence ultimately was fatal.[10]

The allegations plausibly support an inference that Defendants Valley and McKinley knew or had reason to know that maintaining inadequate staffing within

[10] In *Hunter*, the fact that a probationer was considered a forcible rapist and "reasonable minds might find that he was a threat to commit rape again," along with a generalized statement that people can be killed during rape did not suffice to satisfy the specific harm requirement when the probationer committed a murder. 57 P.3d at 761. Here, however, Johnson identifies conditions on G Block that allegedly exposed inmates to prolonged, unchecked opportunities for violence within the shared cell. The alleged danger arises from the purported conditions on G Block combined with the lack of timely intervention, rather than a stratification of the violence as fatal or non-fatal.

G block created an unreasonable risk and high probability of inmate violence occurring in the shared cells without a response. Johnson further alleges that this led to Mr. Warnock's death. Whether she can prove the requisite degree of foreseeability is a question to be answered by the finder of fact.

iii. Inadequate Tier Checks and Non-Expeditious Medical Response

Johnson sufficiently alleges reckless, willful and wanton conduct by failing to timely conduct tier checks. The alleged failure does not by itself establish such conduct. However, when considered in the context of the conditions on G block that Johnson has alleged, as well as the purpose of tier checks, such a policy was particularly important to detecting violence within the cells and intervening. The fact that Defendants were assigned to G block, were instructed to confirm "living and breathing" inmates within the cells, and the prolonged intermittence between tier checks support an inference that Defendants knowingly allowed tier checks to go unperformed despite the foreseeability of the resulting danger, inmate violence occurring without intervention. The allegations provide plausible support for an inference that Defendants' omission created an unreasonable risk and high probability of harm.

However, this is not the case for Johnson's allegation that Defendants violated the ITCA by "[n]ot expeditiously providing life saving measures upon

discovery that Mr. Warnock had been violently beaten[.]" Amd. Compl. ¶ 184. Specifically, she alleges that:

> 129. A little after 11:00 a.m., [a corrections officer] alerted other officers that he saw blood coming out of the cell.
>
> 130. Officer Uribe ordered the tier janitors to cell up in the showers.
>
> 131. Uribe called out an emergency and a request for additional staff.
>
> 132. The officers delayed some period of time before opening the cell door.
>
> 133. Several minutes later, [another corrections officer] arrived from a different tier on G block. Once the cell door was opened, she began chest compressions until a nurse from the medical unit arrived, who then took over CPR.

*Id*. at ¶¶ 129-33.

While Johnson does not explain in her briefing why this is reckless, willful and wanton conduct, she is presumably referring to the delay in officers opening the cell. However, that allegation is flanked by allegations that Defendant Uribe declared an emergency and requested additional staff, and another corrections officer began life saving measures immediately upon the cell door being opened. To consider this reckless, willful and wanton conduct would require an unreasonable inference that Defendant Uribe called out an emergency and requested backup, and then Defendants opted to simply wait outside the cell without reason, before entering and immediately rendering medical aid.

iv. Defendant Nicodemus

Johnson's claim against Defendant Nicodemus is also dismissed. Defendant Nicodemus is named only in Johnson's ITCA claim. The extent of the allegations concerning him are that:

> 99. Mr. Warnock talked to a case manager about trying to be housed somewhere other than G block. That case manager referred him to Captain Tyler Nicodemus.
>
> 100. On information and belief, Mr. Warnock contacted Captain Nicodemus and told him of his desire to move. Captain Nicodemus did not order a housing move, though he had the authority to intervene.

Amd. Compl. ¶¶ 99-100.

These allegations do not plausibly establish that Defendant Nicodemus' conduct was reckless, willful and wanton. Johnson does not allege that Nicodemus was aware of J.J.'s warning, nor does she identify any other facts showing that Defendant Nicodemus knew or had reason to know that leaving Mr. Warnock in the cell with J.J. was highly likely to result in physical violence without intervention. Johnson has alleged only that Mr. Warnock complained of "poor conditions on the block and how he did not belong there." *Id*. at ¶ 98. Although foreseeability ordinarily presents a factual question, Johnson's pleadings must still plausibly satisfy the heightened foreseeability required by the statute. *See Hunter*, 57 P.3d at 760-61. Johnson has not done so. Claim V is dismissed as to Defendant Nicodemus without prejudice.

*D. The Discretionary Function Exception*

Governmental entities and their employees acting without malice or criminal intent are immune from liability for any claim which:

> Arises out of any act or omission of an employee of the governmental entity exercising ordinary care, in reliance upon or the execution or performance of a statutory or regulatory function, whether or not the statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused.

I.C. § 6-904(1).

"The discretionary function exception applies to governmental decisions entailing planning or policy formation." *Dorea Enters., Inc. v. City of Blackfoot*, 163 P.3d 211, 214 (2007) (citation omitted). To determine whether the exception applies, courts first examine the nature and quality of the challenged actions, then examine the underlying policies of the discretionary function. *Williamson v. Ada Cnt'y*, 509 P.3d 1133, 1139 (Idaho 2022). The underlying policies are: "to permit those who govern to do so without being unduly inhibited by the threat of liability for tortious conduct, and also, to limit judicial re-examination of basic policy decisions properly entrusted to other branches of government." *Dorea Enters., Inc.*, 163 P.3d at 214. A decision need only be susceptible to policy analysis; Defendants are not required to demonstrate that they actually considered any policy factors. *Williamson*, 503 P.3d at 1140.

The Court must first examine the "nature and quality" of the alleged actions of Defendants to determine whether those are classified as operational—daily, routine decisions not involving policy considerations—or discretionary—policy-based decisions grounded in a consideration for financial, political, economic, or social effects. *See id.* at 1139.

Johnson's allegations regarding the assignment of J.J. to Mr. Warnock's cell, and subsequent failure to separate the two, plausibly concern operational conduct. The allegations challenge Defendants' handling of a particular cell assignment and subsequent request for separation. Although an exercise of judgment is of course inherent in determining and authorizing inmate move ins and outs, this alone does not establish that it was a discretionary action. As pleaded, these allegations plausibly implicate the routine implementation of prison housing practices, and do not establish that the challenged decisions involved broader policy judgments. That Defendants may have acted pursuant to a policy concerning housing arrangements does not itself transform the effectuation of that policy into a discretionary decision.

The missed tier checks likewise are an operational action. Johnson alleges that Defendants were required to conduct safety checks within at most thirty-minute intervals. Amd. Compl. ¶ 111. During these checks, the officers were allegedly required to look into the cells to confirm that inmates were "living and

breathing." *Id*. at ¶ 110. She further alleges that Defendants failed to perform checks as frequently as required. *Id*. at ¶ 109. The alleged lapse in performing the checks is not susceptible to policy analysis—it is a purported failure by Defendants to properly perform an aspect of their job.

However, Johnson's allegation that Defendants acted recklessly, willfully and wantonly by "[n]ot staffing a special housing unit like G block with adequate correctional officers" falls within the discretionary-function exception. Amd. Compl. ¶ 179. Determining how many correctional officers to assign to one of a number of housing units entails allocating personnel and financial resources among competing needs at ISCC. Such decisions are susceptible to policy analysis and therefore fall within the discretionary-function exception. *See Dorea Enters.*, 163 P.3d at 215 (Idaho 2007) (sewer department supervisor took budgetary constraints and social considerations into account when reaching decision to flush lines annually). Permitting Johnson to proceed on this allegation would contravene the underlying policies of the exception. It would necessarily entail a judicial re-examination of the resource allocation decisions that the exception protects. *See City of Lewiston v. Lindsey*, 853 P.2d 596, (Idaho Ct. App. 1993) ("When and how many financial and human resources should be allocated to perform the myriad tasks of running the City of Lewiston are basic policy decisions . . . ."). Claim V is dismissed to the extent that it alleges inadequate staffing.

Johnson's allegation that Defendants acted recklessly, willfully and wantonly by "[n]ot adequately training correctional officers in G block" is also precluded by the discretionary-function exception. Amd. Compl. ¶ 181. This broad allegation encompasses all aspects of officer training, which necessarily implicates policy decisions about institutional priorities, what knowledge and skills officers need to perform their dues, and the allocation of resources available to effectuate such training. These decisions are grounded in considerations for financial and social effects. *See Gager v. U.S.*, 149 F.3d 918, 920 (9th Cir. 1998) (Postal Service's decision to limit training on recognizing mail bombs only to areas where known threats existed fell under the discretionary function exception of the Federal Tort Claims Act). This allegation again asks the Court to re-examine the policy decisions properly entrusted to other branches of the government. Claim V is dismissed to the extent that it alleges inadequate training.

## ORDER

**IT IS ORDERED that:**

1. Defendants' Motion to Dismiss (Dkt. 13) is **GRANTED IN PART AND DENIED IN PART**.

2. The Motion to Dismiss Claims I, II, and IV is **DENIED.**

3. The Motion Dismiss Claim III is **GRANTED IN PART** as to the claims of inadequate training and **DENIED IN PART** as to the claims of

inadequate staffing.

3. The Motion to Dismiss Claim V is **GRANTED IN PART AND DENIED IN PART.** Claim V is **DISMISSED WITH PREJUDICE** as to Defendant State of Idaho, Department of Correction. Claim V is **DISMISSED WITHOUT PREJUDICE** as to Defendant Tyler Nicodemus. Claim V is **DISMISSED WITHOUT PREJUDICE** as to allegations related to: a lack of, or failure to follow, policies, practices, and customs as contained in paragraphs 176-178; a lack of adequate staffing and training as contained in paragraph 179 and 181; and the lack of expeditious life saving measures as contained in paragraph 184.

5. Pursuant to Federal Rule of Civil Procedure 4(m), Plaintiff is given notice that the Court intends to dismiss the Amended Complaint as to Defendant Gregory Wooten *sua sponte*, absent a showing of good cause or excusable neglect for failure to serve.

DATED: September 29, 2026

B. Lynn Winmill
U.S. District Court Judge